# UNITED STEELWORKERS OF AMERICA, AFL–CIO–CLC *v.* SADLOWSKI ET AL.

No. 81–395.   Argued March 31, 1982—Decided June 14, 1982

MARSHALL, J., delivered the opinion of the Court, in which POWELL, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. WHITE, J., filed a dissenting opinion, in which BURGER, C. J., and BRENNAN and BLACKMUN, JJ., joined, *post*, p. 121.

*Michael H. Gottesman* argued the cause for petitioner. With him on the brief were *Robert M. Weinberg* and *Laurence Gold.*

*Joseph L. Rauh, Jr.*, argued the cause for respondents. With him on the brief were *John Silard, Joseph A. Yablonski*, and *Daniel B. Edelman.**

JUSTICE MARSHALL delivered the opinion of the Court.

In this case, we confront the question whether § 101(a)(2) of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 73 Stat. 522, 29 U. S. C. § 411(a)(2), precludes the membership of a union from adopting a rule that prohibits candidates for union office from accepting campaign contributions from nonmembers. The United States Court of Appeals for the District of Columbia Circuit held that such a rule violated § 101(a)(2). 207 U. S. App. D. C. 189, 645 F. 2d 1114 (1981). We granted certiorari, 454 U. S. 962 (1981), and now reverse.

I

A

Petitioner United Steelworkers of America (USWA), a labor organization with 1,300,000 members, conducts elections for union president and other top union officers every four years. The elections for these officers are decided by referendum vote of the membership. In the 1977 election, which was hotly contested, two candidates ran for president: respondent Edward Sadlowski, Jr., the Director of USWA's largest district, and Lloyd McBride, another District Director.[1] Both Sadlowski and McBride headed a slate of candidates for the other top union positions.

McBride was endorsed by the incumbent union leadership, and received substantial financial support from union officers and staff. Sadlowski, on the other hand, received much of his financial support from sources outside the union. During the campaign, the question whether candidates should accept

---

*Charles S. Sims* filed a brief for the American Civil Liberties Union as *amicus curiae* urging affirmance.

[1] The USWA is divided into 25 districts, which are headed by District Directors. District Directors are elected every four years by referendum vote of the members within each district. App. 7.

contributions from persons who were not members of the union was vigorously debated. The McBride slate contended that outsider participation in USWA elections was dangerous for the union. App. 27, n. 2, 298. See also *id.*, at 129, 398; see generally *id.*, at 40–48. McBride ultimately defeated Sadlowski by a fairly wide margin—57% to 43%. The other candidates on the McBride slate won by similar margins.

After the elections, union members continued to debate the question whether outsider participation in union campaigns was desirable. This debate was finally resolved in 1978, when USWA held its biennial Convention. The Convention, which consists of approximately 5,000 delegates elected by members of USWA's local unions, is USWA's highest governing body. At the 1978 Convention, several local unions submitted resolutions recommending amendment of the USWA Constitution to include an "outsider rule" prohibiting campaign contributions by nonmembers. The union's International Executive Board also recommended a ban on nonmember contributions. Acting on the basis of these recommendations, the Convention's Constitution Committee proposed to the Convention that it adopt an outsider rule. After a debate on the floor of the Convention, the delegates, by a margin of roughly 10 to 1, voted to include such a rule in the Constitution. *Id.*, at 35–36, 81–105.

The outsider rule, Article V, § 27, of the USWA Constitution (1978), provides in pertinent part:

> "Sec. 27. No candidate (including a prospective candidate) for any position set forth in Article IV, Section 1, and supporter of a candidate may solicit or accept financial support, or any other direct or indirect support of any kind (except an individual's own volunteered personal time) from any non-member."[2]

[2] The offices set forth in Article IV, Section 1 of the USWA Constitution are International President, International Secretary, International Treasurer, International Vice President (Administration), International Vice

Section 27 confers authority upon the International Executive Board to adopt regulations necessary to implement the provision. It also creates a Campaign Contribution Administrative Committee, consisting of three "distinguished, impartial" nonmembers to administer and enforce the provision. The Committee may order a candidate to cease and desist from conduct that breaches § 27, and may declare a candidate disqualified. Its decisions are final and binding.

## B

In October 1979, Sadlowski and several other individuals[3] filed suit against USWA in the United States District Court for the District of Columbia. They claimed, *inter alia*, that the outsider rule violated the "right to sue" provision of Title I of the LMRDA, § 101(a)(4), 73 Stat. 522, 29 U. S. C. § 411(a)(4), because it would prohibit a candidate from accepting nonmember contributions to finance campaign-related litigation. Both sides moved for summary judgment. The District Court found that the rule violated § 101(a)(4). 507 F. Supp. 623, 625 (1981). The District Court further decided to invalidate the rule *in toto*, because the portion of the rule that "limits meaningful access to the courts . . . cannot be separated or isolated from the rule in its entirety." *Ibid.*

The United States Court of Appeals for the District of Columbia Circuit affirmed. 207 U. S. App. D. C. 189, 645

---

President (Human Affairs), District Director for the 25 Districts, and a National Director for Canada.

[3] Other plaintiffs included Joseph Samargia, a USWA member and potential candidate for union office; Edward Sadlowski, Sr., a retired union member who campaigned for his son in 1977; Leonard S. Rubenstein, a nonmember who made contributions to Sadlowski, Jr., during the 1977 campaign; and James Miller, a nonmember who donated legal services during the 1977 campaign. Samargia alleged that he might run for union office in the 1981 elections. Sadlowski, Sr., Rubenstein, and Miller alleged that they might wish to contribute services or funds in future USWA elections. App. 5–6, 16. Each of these individuals is also a respondent here.

F. 2d 1114 (1981). The court agreed that Article V, §27, violated the right-to-sue provision. However, it chose not to decide whether this violation alone justified an injunction restraining enforcement of the entire rule. It accepted respondents' argument, first raised on appeal, that the outsider rule also violated the §101(a)(2) "freedom of speech and assembly" provision, and that this violation justified the injunction. The Court of Appeals reasoned that the statutory goal of union democracy could be achieved only if "effective challenges can be made to the often-entrenched union leadership." 207 U. S. App. D. C., at 197, 645 F. 2d, at 1122. But effective challenges are possible only if insurgent candidates can solicit contributions from outsiders. "Even without contribution limitations, challengers to the union leadership face substantial barriers, especially the electoral power of the union staff." *Id.*, at 196, 645 F. 2d, at 1121. The court rejected the union's argument that even if the rule interfered with rights protected by the statute, it was protected by the proviso to §101(a)(2), which gives a union authority to adopt "reasonable" rules regarding the responsibilities of its members. *Id.*, at 198, 645 F. 2d, at 1123.

To buttress its analysis, the Court of Appeals relied heavily on its understanding of First Amendment jurisprudence. It stated that §101(a)(2) places "essentially the same limits on labor unions with respect to outside campaign contributions that the First Amendment would if it applied to labor unions." *Id.*, at 195, 645 F. 2d, at 1120. Citing *Buckley* v. *Valeo*, 424 U. S. 1, 19 (1976) *(per curiam)*, the Court of Appeals suggested that contribution rules that prevent candidates for political office from amassing the resources necessary for effective advocacy are unconstitutional. By analogy, since the outsider rule would interfere with effective advocacy in union campaigns, it must violate §101(a)(2). 207 U. S. App. D. C., at 197, 645 F. 2d, at 1122.

## II

Section 101(a)(2) is contained in Title I of the LMRDA, the "Bill of Rights of Members of Labor Organizations." See 29 U. S. C. §§ 411–415. It provides:

> "FREEDOM OF SPEECH AND ASSEMBLY.—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided*, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations." 73 Stat. 522.

We must decide whether this statute is violated by a union rule that prohibits candidates for union office from accepting campaign contributions from individuals who are not members of the union.

## A

At the outset, we address respondents' contention that this case can be resolved simply by reference to First Amendment law. Respondents claim that § 101(a)(2) confers upon union members rights equivalent to the rights established by the First Amendment. They further argue that in the context of a political election, a rule that placed substantial restrictions on a candidate's freedom to receive campaign contributions would violate the First Amendment. Thus, a rule that substantially restricts contributions in union campaigns must violate § 101(a)(2). We are not persuaded by this argu-

ment. In light of the legislative history, we do not believe that § 101(a)(2) should be read as incorporating the entire body of First Amendment law, so that the scope of protections afforded by the statute coincides with the protections afforded by the Constitution.

The legislation that ultimately evolved into Title I of the LMRDA was introduced on the floor of the Senate by Senator McClellan. The Senate Committee on Labor and Public Welfare had reported out a bill containing provisions that were the forerunners of Titles II through VI of the LMRDA. These provisions focused on specific aspects of union affairs: they established disclosure requirements and rules governing union trusteeships and elections. See S. 1555, 86th Cong., 1st Sess. (1959), 1 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, pp. 338–396 (1959) (Leg. Hist.); see also *Finnegan* v. *Leu*, 456 U. S. 431, 435–436 (1982). Senator McClellan and other legislators feared that the bill did not go far enough because it did not provide general protection to union members who spoke out against the union leadership. Senator McClellan therefore proposed an amendment that he described as a "Bill of Rights" for union members. This amendment, which contained the forerunner of § 101(a)(2), as well as the forerunners of other Title I provisions, was designed to guarantee every union member equal voting rights, rights of free speech and assembly, and a right to sue. 105 Cong. Rec. 6469–6493 (1959), 2 Leg. Hist. 1096–1119.

Senator McClellan hoped that the amendment would "bring to the conduct of union affairs and to union members the reality of some of the freedoms from oppression that we enjoy as citizens by virtue of the Constitution of the United States." 105 Cong. Rec. 6472 (1959), 2 Leg. Hist. 1098. He further stated: "[T]he rights which I desire to have spelled out in the bill are not now defined in the bill. Such rights are basic. They ought to be basic to every person, and they are,

under the Constitution of the United States." 105 Cong. Rec. 6478 (1959), 2 Leg. Hist. 1104–1105. Senator McClellan explained the freedom of assembly provision, in particular, as follows:

> "That [provision] gives union members the right to assemble in groups, if they like, and to visit their neighbors and to discuss union affairs, and to say what they think, or perhaps discuss what should be done to straighten out union affairs, or perhaps discuss the promotion of a union movement, or perhaps a policy in which they believe. They would be able to do all of that without being punished for doing it, as is actually happening today." 105 Cong. Rec. 6477 (1959), 2 Leg. Hist. 1104.

Other Senators made similar statements. See 105 Cong. Rec. 6483 (1959) (Sen. Curtis); id., at 6488 (Sen. Goldwater); id., at 6489 (Sen. Mundt); id., at 6490 (Sen. Dirksen); id., at 6726 (Sen. Javits); 2 Leg. Hist. 1109, 1115, 1116, 1238.

The McClellan amendment was adopted by a vote of 47–46. 105 Cong. Rec. 6492 (1959), 2 Leg. Hist. 1119. Shortly thereafter, Senator Kuchel offered a substitute for the McClellan amendment. This substitute added the proviso that now appears in § 101(a)(2), which preserves the union's right to adopt reasonable rules governing the responsibilities of its members. It was designed to remove "the extremes raised by the [McClellan] amendment," 105 Cong. Rec. 6722 (1959), 2 Leg. Hist. 1234 (Sen. Cooper), and to assure that the amendment would not "unduly harass and obstruct legitimate unionism." 105 Cong. Rec. 6721 (1959), 2 Leg. Hist. 1233 (Sen. Church). The Kuchel amendment was approved by a vote of 77–14. See 105 Cong. Rec. 6717–6727 (1959), 2 Leg. Hist. 1229–1239. The legislation was then taken up in the House of Representatives. The House bill, which contained a "Bill of Rights" identical to that adopted by the Senate, was quickly approved. H. R. 8400, 86th Cong., 1st Sess. (1959), 1 Leg. Hist. 628–633.

This history reveals that Congress modeled Title I after the Bill of Rights, and that the legislators intended § 101 (a)(2) to restate a principal First Amendment value—the right to speak one's mind without fear of reprisal. However, there is absolutely no indication that Congress intended the scope of § 101(a)(2) to be identical to the scope of the First Amendment. Rather, Congress' decision to include a proviso covering "reasonable" rules refutes that proposition. First Amendment freedoms may not be infringed absent a compelling governmental interest. Even then, any government regulation must be carefully tailored, so that rights are not needlessly impaired. *Brown* v. *Hartlage*, 456 U. S. 45, 53–54 (1982). Union rules, by contrast, are valid under § 101(a)(2) so long as they are reasonable; they need not pass the stringent tests applied in the First Amendment context.

## B

To determine whether a union rule is valid under the statute, we first consider whether the rule interferes with an interest protected by the first part of § 101(a)(2). If it does, we then determine whether the rule is "reasonable" and thus sheltered by the proviso to § 101(a)(2). In conducting these inquiries, we find guidance in the policies that underlie the LMRDA in general and Title I in particular. First Amendment principles may be helpful, although they are not controlling. We must look to the objectives Congress sought to achieve, and avoid "'placing great emphasis upon close construction of the words.'" *Wirtz* v. *Glass Bottle Blowers*, 389 U. S. 463, 468, and n. 6 (1968) (quoting Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich. L. Rev. 819, 852 (1960)); *Hall* v. *Cole*, 412 U. S. 1, 11, and n. 17 (1973).[4] The critical question is whether a rule

---

[4] Neither the language contained in the first part of § 101(a)(2), which describes the "right to meet and assemble freely," nor the language contained in the proviso, which states that unions may adopt "reasonable rules as to the responsibility of every member toward the organization as an in-

that partially interferes with a protected interest is nevertheless reasonably related to the protection of the organization as an institution.

Appyling this form of analysis here, we conclude that the outsider rule is valid. Although it may limit somewhat the ability of insurgent union members to wage an effective campaign, an interest deserving some protection under the statute, it is rationally related to the union's legitimate interest in reducing outsider interference with union affairs.

### (1)

An examination of the policies underlying the LMRDA indicates that the outsider rule may have some impact on interests that Congress intended to protect under § 101(a)(2). Congress adopted the freedom of speech and assembly provision in order to promote union democracy. See *supra*, at 109–111; see also S. Rep. No. 187, 86th Cong., 1st Sess., 2 (1959), 1 Leg. Hist. 398; H. R. Rep. No. 741, 86th Cong., 1st Sess., 2 (1959), 1 Leg. Hist. 760. It recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal. Congress also recognized that this freedom is particularly critical, and deserves vigorous protection, in the context of election campaigns. For it is in elections that members can wield their power, and directly express their approval or disapproval of the union leadership. See S. Rep. No. 187, *supra*, at 2–5, 7, 1 Leg. Hist. 398–401, 403; H. R.

---

stitution," should be read narrowly. As we have already indicated, it seems clear that Congress intended the first part of § 101(a)(2) to be given a flexible interpretation. See *supra*, at 109–111; see also *infra*, at 112–113. And Congress adopted the proviso in order to ensure that the scope of the statute was limited by a general rule of reason. It indicated that the courts are to play a role in the determination of reasonableness. See 105 Cong. Rec. 6719 (1959) (Sen. Kuchel), 2 Leg. Hist. 1231; 105 Cong. Rec. 6726 (1959) (Sen. Javits), 2 Leg. Hist. 1238. See also *supra*, at 110. See generally 105 Cong. Rec. 6717–6727 (1959), 2 Leg. Hist. 1229–1239.

Rep. No. 741, *supra*, at 1–7, 15–16, 1 Leg. Hist. 759–765, 773–774.[5]

The interest in fostering vigorous debate during election campaigns may be affected by the outsider rule. If candidates are not permitted to accept contributions from persons outside the union, their ability to criticize union policies and to mount effective challenges to union leadership may be weakened. Restrictions that limit access to funds may reduce the number of issues discussed, the attention that is devoted to each issue, and the size of the audience reached. Cf. *Buckley* v. *Valeo*, 424 U. S., at 65–66 *(per curiam)* (First Amendment freedom of expression and association may be "diluted if it does not include the right to pool money through contributions, for funds are often essential if 'advocacy' is to be truly or optimally 'effective'").[6]

Although the outsider rule does affect rights protected by the statute, as a practical matter the impact may not be substantial. Respondents, as well as the Court of Appeals, suggest that incumbents have a large advantage because they can rely on their union staff during election campaigns. Challengers cannot counter this power simply by seeking funds from union members; the rank and file cannot provide

---

[5] See also *Hall* v. *Cole*, 412 U. S. 1, 14 (1973) ("Title I of the LMRDA was specifically designed to protect the union member's right to seek higher office within the union"). Cf. *Wirtz* v. *Glass Bottle Blowers*, 389 U. S. 463, 470 (1968) (Title IV designed to ensure free and democratic elections).

[6] In several First Amendment cases, we have protected contribution and solicitation of the financial support necessary to further effective advocacy. See, *e. g.*, *Citizens Against Rent Control* v. *Berkeley*, 454 U. S. 290 (1981); *Village of Schaumburg* v. *Citizens for Better Environment*, 444 U. S. 620 (1980); *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765 (1978). These cases are not directly analogous, however. Contribution limitations potentially infringe the First Amendment rights of contributors as well as candidates. *Buckley* v. *Valeo*, 424 U. S., at 24–25 *(per curiam)*. Here, the nonmember *contributors* have no right of expression protected by the statute.

sufficient support. Thus, they must be permitted to seek funds from outsiders. In fact, however, the rank and file probably can provide support. The USWA is a very large union whose members earn sufficient income to make campaign contributions. See App. 118–120. Requiring candidates to rely solely on contributions from members will not unduly limit their ability to raise campaign funds. Uncontradicted record evidence[7] discloses that challengers have been able to defeat incumbents or administration-backed candidates, despite the absence of financial support from nonmembers. See *id.*, at 25, 118–119.[8]

In addition, although there are undoubtedly advantages to incumbency, see *Hall* v. *Cole,* 412 U. S., at 13, respondents and the Court of Appeals may overstate those advantages. Staff employees are forbidden by § 401(g) of the LMRDA, 29 U. S. C. § 481(g), and by internal USWA rules to campaign on union time or to use union funds, facilities, or equipment for campaign purposes. App. 110–117; see 29 CFR § 452.76 (1981). Staff officers have a contractual right to choose whether or not to participate in any USWA campaign with-

---

[7] This case is here on cross-motions for summary judgment. We reach a conclusion opposite to that reached by the Court of Appeals—that the outsider rule is valid. In making this decision, we have assumed that all of the evidence submitted by respondents is true. In addition, we have relied on evidence submitted by the union only when it is uncontradicted.

Here, to support their claim that incumbents have a large advantage in union elections, respondents have submitted numerous affidavits. We do not intend to deny the existence of this advantage. For the purposes of our decision in this case, we think it sufficient to observe that there is uncontradicted evidence demonstrating that effective campaigns have been mounted by nonincumbents—and that the interference with interests protected by § 101(a)(2) is only partial.

[8] USWA has submitted evidence suggesting that the adoption of the outsider rule did not have an adverse effect on the 1981 election campaigns. A nonincumbent candidate for District Director in a relatively small district has testified that he had raised in excess of $30,000 from rank-and-file members as early as 15 months before the election. App. 121–123, 217–218. Respondents have not submitted any opposing evidence.

out being subjected to discipline or reprisal for their decision. See App. 107–110, 115–117, 228, 384–385. Indeed, USWA elections have frequently involved challenges to incumbents by members of the staff. Many of these challenges have been successful. *Id.*, at 108, 201–216.

The impact of the outsider rule on rights protected under § 101(a)(2) is limited in another important respect. The union has stated that the rule would not prohibit union members who are not involved in a campaign from using outside funds to address particular issues. That is, members could solicit funds from outsiders in order to focus the attention of the rank and file on a specific problem. The fact that union members remain free to seek funds for this purpose will serve as a counter to the power of entrenched leadership, and ensures that debate on issues that are important to the membership will never be stifled.

### (2)

Although the outsider rule may implicate rights protected by § 101(a)(2), it serves a legitimate purpose that is clearly protected under the statute. The union adopted the rule because it wanted to ensure that nonmembers do not unduly influence union affairs. USWA feared that officers who received campaign contributions from nonmembers might be beholden to those individuals and might allow their decisions to be influenced by considerations other than the best interests of the union. The union wanted to ensure that the union leadership remained responsive to the membership. See App. 210; see also *id.*, at 61–62, 81–97, 275, 303, 304.[9] An

---

[9] Respondents allege that the rule was forced upon the union members by high union officers, who wanted to ensure that they were insulated from effective challenges in future elections. However, the record does not support respondents' claims. The outsider rule was adopted through democratic processes, and was favored by an overwhelming majority of the delegates to the 1978 Convention. See *supra*, at 105. These delegates had been elected by the rank and file. See App. 301–302.

examination of the policies underlying the LMRDA reveals that this is a legitimate purpose that Congress meant to protect.

Evidence that Congress regarded the desire to minimize outsider influence as a legitimate purpose is provided by the history to Title I. On the Senate floor, Senator McClellan argued that a bill of rights for union members was necessary because some unions had been "invaded" or "infiltrated" by outsiders who had no interest in the members but rather had seized control for their own purposes. 105 Cong. Rec. 6469–6474 (1959), 2 Leg. Hist. 1097–1100. He stated that the strongest support for the bill of rights provisions "should come from traditional union leaders. It will protect them from the assaults of those who would capture their unions." 105 Cong. Rec. 6472 (1959), 2 Leg. Hist. 1098. And he stated:

> "[Infiltration could be ended] by placing the ultimate power in the hands of the members, where it rightfully belongs, so that they may be ruled by their free consent, [and] may bring about a regeneration of union leadership. I believe the unions should be returned to those whom they were designed to serve; they should not be left to the hands of those who act as masters. The union must be returned to their members, to whom they rightfully belong." 105 Cong. Rec. 6472 (1959), 2 Leg. Hist. 1099.

It is true that Senator McClellan was particularly concerned about infiltration of unions by racketeers: he described situations in which "thugs and hoodlums" had taken over unions so that they could exploit the members for pecuniary gain. 105 Cong. Rec. 6471 (1959), 2 Leg. Hist. 1097. However, his statements also indicate a more general desire to ensure that union members, and not outsiders, control the affairs of their union.

Additional evidence that Congress regarded the union's desire to maintain control over its own affairs as legitimate is provided by the history of other sections of the LMRDA. In drafting Titles II through VI, Congress was guided by the general principle that unions should be left free to "operate their own affairs, as far as possible." S. Rep. No. 1684, 85th Cong., 2d Sess., 4–5 (1958). It believed that only essential standards should be imposed by legislation, and that in establishing those standards, great care should be taken not to undermine union self-government. Given certain minimum standards, "individual members are fully competent to regulate union affairs." *Ibid.* Thus, for example, in Title IV, which regulates the conduct of union elections, Congress simply set forth certain minimum standards. So long as unions conform with these standards, they are free "to run their own elections." *Wirtz* v. *Glass Bottle Blowers*, 389 U. S., at 471. Congress' desire to permit unions to regulate their own affairs and to minimize governmental intervention suggests that it would have endorsed union efforts to reduce outsider influence.

Indeed, specific provisions contained in Title IV provide support for our conclusion that the outsider rule serves a legitimate and protected purpose. Section 401(g), 29 U. S. C. § 481(g), prohibits the use of employer as well as union funds in election campaigns. This ban reflects a desire to minimize the danger that employers will influence the outcome of union elections. A union rule that seeks to reduce the influence of outsiders other than employers is clearly consistent with that goal. See also § 403 of Title IV of the LMRDA, 29 U. S. C. § 483 (authorizing unions to establish their own election rules).[10]

---

[10] Section 403 provides: "No labor organization shall be required by law to conduct elections of officers with greater frequency or in a different form or manner than is required by its own constitution or bylaws, except as otherwise provided by [Title IV]." 73 Stat. 534. The union argues that the

Respondents argue that even if the desire to reduce outside influence is a legitimate purpose, the rule is not rationally related to that purpose. They contend, first, that the union could simply have established contribution ceilings, rather than placing an absolute ban on nonmember contributions. However, USWA feared not only that a few individual nonmembers would make large contributions, but also that outsiders would solicit many like-minded persons for small contributions which, when pooled, would have a substantial impact on the election. This fear appears to have been reasonable. In the 1977 election, Sadlowski received a significant percentage of his campaign funds from individuals who made contributions after receiving mail solicitations signed by prominent nonmembers. App. 128–129, 350–353.

Respondents also contend that even if the union was justified in limiting contributions by true outsiders, it need not have limited contributions by relatives and friends. Again, however, the USWA had a reasonable basis for its decision to impose a broad ban. An exception for family members and friends might have created a loophole that would have made the rule unenforceable: true outsiders could simply funnel their contributions through relatives and friends. See *id.*, at 32. Cf. *Buckley* v. *Valeo*, 424 U. S., at 53, n. 59 (Congress could constitutionally subject family members to the same limitations as nonfamily members).

Finally, respondents contend that USWA could simply have required that candidates for union office reveal the sources of their funds. But a disclosure rule, by itself, would not have solved the problem. Candidates who received such funds might still be beholden to outsiders. A disclosure requirement ensures only that union members know about this

outsider rule can be justified solely on the basis of this provision, since the rule is otherwise consistent with Title IV. We are not persuaded by this argument. Section 403 must be interpreted in light of the provisions of Title I, which were adopted precisely because Congress feared that Titles II through VI did not provide sufficient protection to union members. Thus, even if the rule satisfies § 403, it must also satisfy Title I.

possibility when they cast their votes. It does not eradicate the threat of outside influence.[11]

## III

As an alternative basis for sustaining the result below, respondents ask this Court to hold that the outsider rule impermissibly encroaches upon a union member's right, guaranteed by § 101(a)(4) of the LMRDA, to institute legal proceedings, and that the appropriate remedy for this violation is an injunction striking down the rule *in toto*. However, unlike the District Court and the Court of Appeals, we do not believe that the union's rule violates the right-to-sue provision.

Section 101(a)(4) provides that a union may not "limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency." 29 U. S. C. § 411(a)(4). The outsider rule would clearly violate this provision if it prohibited union members from accepting financial or other support from nonmembers for the purpose of conducting campaign-related litigation. In our view, however, the outsider rule simply does not apply where a member uses funds from outsiders to finance litigation.

The language of the rule contains no reference to litigation. In addition, the debates leading up to the passage of the rule do not contain any indication that the union intended the rule to apply in this context. But what is most persuasive, the Campaign Contribution Administrative Committee[12]—which

---

[11] Respondents also contend that the outsider rule is underinclusive, because it does not apply to local union elections. As USWA explains in an unrebutted affidavit, however, an outsider rule for local union elections was considered and rejected because outsiders generally have little interest in influencing local campaigns, and enforcing an outsider rule in such elections would be an administrative burden. App. 30–32.

[12] The three Committee members included former Secretary of Labor W. Willard Wirtz; David Lewis, professor at Carleton University; and Eric Springer, former Director of Compliance of the United States Equal Em-

was given authority to make final and binding interpretations of the outsider rule—has issued an opinion concerning the impact of the outsider rule on the right to sue. In this opinion, it holds that "the limitations imposed by Section 27 do not apply to the financing of lawsuits by non-members for the purpose of asserting the legal rights of candidates or other union members in connection with elections."[13] App. 455; see also *id.*, at 456–458.[14]

The Court of Appeals expressed concern about a regulation contained in the USWA's Elections Manual which provides that although the outsider rule "does not prohibit the candidate's use of financial support or services from non-members to pay fees for legal or accounting services performed in . . . securing . . . legal rights of candidates," it does prohibit "[a]ctivities which are designed to extract political gain from legal proceedings." *Id.*, at 495. According to the Court of Appeals, the reference to "activities" might include steps in

---

ployment Opportunity Commission and Chairman of the Commission on Human Relations in Pittsburgh, Pa. *Id.*, at 37–38.

[13] The opinion further stated that it was

"confined to services which are in fact legal services customarily performed by lawyers. The Committee recognizes the possibility that any ruling which it makes in general terms and in response to a broad inquiry may be misconstrued or distorted in an attempt to rationalize political activities as 'legal services.' It will deal with these questions whenever they arise on a case-by-case basis." *Id.*, at 458.

[14] The Committee left open the question whether the outsider rule would apply to a lawsuit that is not a bona fide attempt to secure an adjudication of legal rights, but, rather, is motivated solely by a desire to promote a candidate's political campaign. *Ibid.* The USWA has urged the Committee not to impose such a ban unless it is clear that the rule would not deter bona fide lawsuits. *Id.*, at 245–246. It is arguable that such a rule might violate § 101(a)(4) if it had the unmistakable effect of deterring bona fide lawsuits by individuals who feared that the Committee might misjudge their motives and impose sanctions. However, the speculative possibility that the Committee will in the future apply the rule in a manner that deters bona fide lawsuits does not justify striking down the rule *in toto* at this time.

the legal proceedings themselves, and might prohibit outside assistance to finance a lawsuit even if it was brought in good faith, if it was designed to extract political gain. 207 U. S. App. D. C., at 194, 645 F. 2d, at 1119. USWA has explained, however, that this language is intended to cover only nonlitigation activities that in some way refer to litigation, such as mailing a flyer announcing a legal victory, or some information learned during discovery.[15] See *id.*, at 193–194, 645 F. 2d, at 1118–1119.[16]

## IV

We hold that USWA's rule prohibiting candidates for union office from accepting campaign contributions from nonmembers does not violate § 101(a)(2). Although it may interfere with rights Congress intended to protect, it is rationally related to a legitimate and protected purpose, and thus is sheltered by the proviso to § 101(a)(2). We reverse the decision below and remand for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE WHITE, with whom THE CHIEF JUSTICE, JUSTICE BRENNAN, and JUSTICE BLACKMUN join, dissenting.

The question before us is what Congress intended when in 1959 it passed § 101(a)(2), the Bill of Rights provision of the LMRDA. That question is best answered by identifying the

---

[15] The Court of Appeals refused to accept this construction. 207 U. S. App. D. C., at 194, 645 F. 2d, at 1119. However, it is consistent with the language of the regulation and is also supported by the Committee's opinion. See n. 14, *supra*, and accompanying text.

[16] Respondents also argue that the decision below can be affirmed on the ground that the outsider rule violates the First Amendment because it interferes with members' and nonmembers' constitutional rights of free speech and free association. However, the union's decision to adopt an outsider rule does not involve state action. See *Steelworkers* v. *Weber*, 443 U. S. 193, 200 (1979).

problem that Congress intended to solve by adopting the provision. The answer, in turn, is not at all difficult to discover.

After long and careful examination and hearings dealing with the labor union movement, Congress found that too often unions were run by entrenched, corrupt leaders who maintained themselves and discouraged challenge by any means available, including violence and threats.[1] As Senator McClellan explained: "[T]he records of our committee's investigations show over and over again that a rank-and-file member dare not risk any opposition to a corrupt or autocratic leadership. If he does so, he may be beaten, his family threatened, his property destroyed or damaged, and he may be forced out of his job—all of these things can happen and have happened." 105 Cong. Rec. 6472 (1959), 2 NLRB Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, p. 1098 (1958) (Leg. Hist.). And again: "Members had better not offer any competition. They

---

[1] The Court of Appeals in this case summarized these findings:

"Prior to the enactment of the LMRDA in 1959 the Select Senate Committee ferreted out widespread corruption, dictatorship and racketeering in a number of large international unions. The Committee found that the President of the Bakery and Confectionary [sic] Workers' International Union of America had 'railroaded through changes in the union constitution which destroyed any vestigial pretenses of union democracy.' Select Committee Report [S. Rep. No. 1417, 85th Cong., 2d Sess.] 129 [1958]. It reported that Dave Beck, General President of the International Brotherhood of Teamsters 'shamefully enriched himself at [the] expense [of the union members] and that in the final instance he capitulated to the forces within the union who promoted the interests of racketeers and hoodlums.' *Id.* at 84. The Committee likewise found Teamster officials joining with others to take over illegal gambling operations with an 'underworld combine,' *id.* at 38–39, and the top officers of the United Textile Workers of America avariciously misappropriating union funds, *id.* at 159. 'Democracy [was] virtually nonexistent' in the International Union of Operating Engineers because the union was ruthlessly dominated through 'violence, intimidation and other dictatorial practices.' *Id.* at 437. Practices in the Teamsters 'advanced the cause of union dictatorship.' *Id.* at 444. The Committee cited other similar instances of widespread abuses in its 462-page Report." 207 U. S. App. D. C. 189, 199, 645 F. 2d 1114, 1124 (1981) (footnote omitted).

had better not seek election. They had better not aspire to the presidency or the secretaryship, or they will be expelled or disciplined." 105 Cong. Rec. 6478 (1959), 2 Leg. Hist. 1104.

This was the problem that Congress meant to solve. As Senator McClellan stated, its goal was to end "autocratic rule by placing the ultimate power in the hands of the members, where it rightfully belongs so that they may be ruled by their free consent, may bring about a regeneration of union leadership. I believe the unions should be returned to those whom they were designed to serve; they should not be left to the hands of those who act as masters." 105 Cong. Rec. 6472 (1959), 2 Leg. Hist. 1099.

What Congress then did was to guarantee the union member's right to run for election, § 401(e), and to guarantee him freedom of speech and assembly. § 101(a)(2). There is no question, and the Court concedes as much, that the Act created statutory protection for the union member's right effectively to run for union office. Without doubt, § 101(a)(2) was not only aimed at protecting the member who speaks his mind on union affairs, even if critical of the leadership, but was also "specifically designed to protect the union member's right to seek higher office within the union." *Hall* v. *Cole*, 412 U. S. 1, 14 (1973). The LMRDA was a major effort by Congress "to insure union democracy." S. Rep. No. 187, 86th Cong., 1st Sess., 2 (1959). The chosen instrument for curbing the abuses of entrenched union leadership was "free and democratic union elections." *Steelworkers* v. *Usery*, 429 U. S. 305, 309 (1977). The abuses of "entrenched union leadership" were to be curbed, among other means, by the "check of democratic elections." *Wirtz* v. *Hotel Employees*, 391 U. S. 492, 499 (1968). These elections were to be modeled on the "political elections in this country." *Wirtz* v. *Hotel Employees, supra,* at 504; *Steelworkers* v. *Usery, supra,* at 309.

The member's right to run for office and to speak and assemble was to be subject to reasonable union rules, but the

reasonableness of a particular rule must surely be judged with reference to the paradigmatic situation that Congress intended to address by guaranteeing free elections: a large union with entrenched, autocratic leadership bent on maintaining itself by fair means or foul. We do not by any means suggest that the USWA had or has the characteristics that led to the enactment of § 101(a)(2), but it is clear that the section should be construed with reference to those unions with the kind of leadership that caused the congressional response. Such a leadership is not only determined to discourage opposition; it also has at its disposal all of the advantages of incumbency for doing so, including the facilities of the union. Those leaders have normally appointed the union staff, the bureaucracy that makes the union run. The staff is dependent upon and totally loyal to the leadership. It amounts to a built-in campaign organization that can be relied upon to make substantial contributions and to solicit others for more. Such a management is in control of the union's communication system and has immediate access to membership lists and to the members themselves. Obviously, even if the incumbents eschew violence, threats, or intimidation, mounting an effective challenge would be a large and difficult endeavor. And if those in office are as unscrupulous as Congress often found them to be, the dimensions of the task facing the insurgent are exceedingly large. But Congress intended to help the members help solve these very difficulties by guaranteeing them the right to run for office and to have free and open elections in the American tradition.

It is incredible to me that the union rule at issue in this case can be found to be a reasonable restriction on the right of Edward Sadlowski, Jr., to speak, assemble, and run for union office in a free and democratic election. The scope and stringency of the rule cannot be doubted. It forbids any candidate for union office and his supporters to solicit or accept financial support from any nonmember. The candidate cannot accept contributions from members of his family, rela-

tives, friends, or well-wishers unless they are members of the union. Retired members such as Edward Sadlowski, Sr., may not contribute; neither may members not in good standing. Even a fully secured loan from a nonmember with a standard rate of interest is forbidden under the rule. The rule goes even further. It forbids the acceptance of "any other direct or indirect support of any kind from any nonmember," except an individual's volunteered personal time.[2] The regulations issued under the rule clearly show that the union intends to prohibit, as far as it is within its power to do so, all nonmember contributions on behalf of a member running for union office. These regulations specify:

> "[W]hen prohibited support is contributed, there will be a presumption that it was accepted by the candidate or his

---

[2] The regulations specify:

" 'Financial Support' means a direct or indirect contribution where the purpose, object or foreseeable effect of the support is to influence the election of a candidate. Financial support includes, but is not limited to:

"1. Contributions of money, securities, or any material thing of value;

"2. Payments to or subscription for fund raising events of any kind (e. g. raffles, dinners, beer or cocktail parties and so forth);

"3. Discounts in the price or cost of goods or services, except to the extent that commercially established discounts are generally available to the customers of the supplier;

"4. Extensions of credit, loans, and other similar forms of finance, except when obtained in the regular course of business of a commercial lending institution and on such terms and conditions as are regularly required by such institutions; and

"5. The payment for the personal services of another person, or for the use of building or office space, equipment or supplies, or advertisements through the media." App. 492.

The regulations also explain that "[e]xamples of indirect support from non-members would include the contribution of cash to a member who in turn makes a contribution to a candidate; the donation of travel expenses, printing services, office supplies, office space, or of clerical, secretarial, or professional services used by a non-member in conjunction with his or her own volunteered service to a candidate; the distribution of election materials with the aid of a volunteer's paid staff; and the procuring of discounts." *Id.*, at 494.

or her supporters, unless they have taken affirmative steps in good faith to dissuade the non-member from providing such support and have taken action to correct the effects of the prohibited support." App. 494.[3]

A candidate unable to rebut this presumption may be disqualified, fined, suspended, or expelled. This is a Draconian rule. How could any candidate "correct the effects of the prohibited support"? The rule thus goes far beyond the limitations on contributions approved in *Buckley* v. *Valeo*, 424 U. S. 1 (1976), and severely limits expenditures as well. The candidate may actually be denied his statutory right to run for office because nonmembers have exercised their own First Amendment rights.

The impact of the rule with respect to Edward Sadlowski, Sr., illustrates the rigor of the rule. It prohibits him from contributing to the campaign of Edward Sadlowski, Jr., even though the elder Sadlowski is the father of the candidate, was a charter member of the USWA, remained a member for 32 years prior to his retirement, and receives a USWA pension, the terms of which are negotiated by USWA's officers.

Restrictions such as this are a far cry from the free and open elections that Congress anticipated and are wholly inconsistent with the way elections have been run in this country. The Court has long recognized the close relationship between the ability to solicit funds and the ability to express views. "[W]ithout solicitation, the flow of . . . information and advocacy would likely cease." *Village of Schaumburg* v. *Citizens for Better Environment*, 444 U. S. 620, 632 (1980).

---

[3] The regulation continues:

"In such cases where prohibited support has been contributed, it is the candidate's obligation to contact immediately the non-member contributor, reject the prohibited support, return the contribution, insist that such support be discontinued, and take whatever action on his own or her own, or as directed by the Committee, may be necessary to eliminate any impact on the election. Full reports must be made to the Committee promptly." *Id.*, at 495.

See also *Schneider* v. *State*, 308 U. S. 147 (1939); *Cantwell* v. *Connecticut*, 310 U. S. 296 (1940); *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council*, 425 U. S. 748, 761 (1976); *Bates* v. *State Bar of Arizona*, 433 U. S. 350, 363 (1977).

In *Thomas* v. *Collins*, 323 U. S. 516 (1945), the Court held that the First Amendment barred enforcement of a state statute requiring a permit before soliciting membership in any labor organization.   Solicitation and speech were deemed to be so intertwined that a prior permit could not be required.   The Court conceded that the "collection of funds" might be subject to reasonable regulation, but concluded that such regulation "must be done and the restriction applied, in such a manner as not to intrude upon the rights of free speech and free assembly." *Id.*, at 540–541.

Specifically with regard to elections and campaign financing, the Court observed in *Buckley* v. *Valeo*, *supra*, at 19:

> "A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.   This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money.   The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs.   Speeches and rallies generally necessitate hiring a hall and publicizing the event."   (Footnote omitted.)

Thus, as the Court of Appeals recognized in this case "'contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy.'"   207 U. S. App. D. C. 189, 197, 645 F. 2d 1114, 1122 (1981), quoting 424 U. S., at 21.

It goes without saying that running for office in a union with 1.3 million members spread throughout the United

States and Canada requires a substantial war chest if the campaign is to be effective and to have any reasonable chance of succeeding. Attempting to unseat the incumbents of union office is a substantial undertaking. As we noted in *Steelworkers* v. *Usery*, 429 U. S., at 311, there is no permanent opposition party within the union. There is only a one-party system consisting of the union's incumbent officers and hired staff all controlled from the top down. "[T]he full-time officers collectively, under the direction of the top officer, constitute the sole political machine for the preservation of their offices and power." J. Edelstein & M. Warner, Comparative Union Democracy 39 (1979). The union involved in this case has some 30 elected positions, its president appoints more than 1,500 office and field staff, and salaries and expenses for union personnel in 1978 totalled over $37 million. App. 141.

Thus, in the best of circumstances, the role of the challenger is very difficult. And if one keeps in mind that Congress intended to give the challenger a fair chance even in a union controlled by unscrupulous leaders with an iron grip on the staff and a willingness to employ means both within and without the law, it is wholly unrealistic to confine the challenger to financial support garnered within the union. Surely, Congress never intended that a union should be permitted to impose such a limitation. As Clyde Summers, a recognized authority in this field, stated in this case on behalf of Sadlowski:

> "Opposition candidates customarily finance their campaigns in the first instance out of their own pockets and out of loans or gifts from friends. They get contributions from sympathetic union members, but at the beginning they may have few open supporters and they do not have a large organization to solicit contributions. They have to do enough publicizing and campaigning to make themselves appear as a viable candidate before they begin to get support from any substantial number of mem-

bers. Even then, the individual contributions of members is inevitably small. Seldom is it enough to mount a really substantial campaign, and it is almost never enough to match the resources of the incumbents." *Id.*, at 156.

"In my opinion, the practical effect of prohibiting all contributions to union election campaigns except those made by union members would be to gravely damage if not destroy the possibility of democratic elections in unions, particularly in large local unions and in international unions. . . .

"If opposition groups are barred from getting any help from the outside, they can, in most situations, have no hopes of mounting an effective campaign." *Id.*, at 160.[4]

---

[4] The following is a summary of other relevant views presented by Mr. Summers, *id.*, at 152–160:

Incumbents in unions elections have four crucial advantages:

"First, and most important, they have control of the paid staff of representatives or business agents who provide the back-bone of the incumbents' political organization. The paid staff owe their jobs to the officers, take orders from the officers, and can be dismissed by the officers. . . . Second, the incumbent officers have control of the union newspaper. There is no such thing as a free and independent press within the union. . . . Third, the incumbents have ready access to members." They have immediate access to names, addresses and telephone numbers of union members. "The law requires equal access to membership lists but there is no practical equality when the incumbent administration includes the secretary treasurer of the union. Fourth, the officers have access to legal services, at the union's expense."

"These advantages are critical when one considers the financing of union election campaigns. . . . [T]he incumbent officers have a paid built-in campaign organization in the paid staff representatives. . . . In short, the incumbents can run a campaign with little or no money," while the opposition must have substantial funds even to get started. For incumbents, the largest single source is the paid staff, and it is quite unrealistic to expect opposition candidates to obtain substantial support from staff representatives who are contributing to those to whom they owe their jobs. Incumbents also raise funds from union members, and in doing so they have a marked advantage over insurgent candidates. Incumbents also raise

130

In addressing itself to union elections, Congress forbade union and employer contributions, but went no further in restricting contributions or expenditures to or on behalf of union candidates for office. The majority emphasizes that Congress was concerned about the control of unions by outsiders and asserts that the challenged rule serves the congressional purpose. It is true, as Senator McClellan explained, that "impositions and abuses . . . have been perpetrated upon the working people of many of our States by the thugs who have muscled into positions of power in labor unions and who masquerade as labor leaders and as friends of working people. . . ." 105 Cong. Rec. 6470 (1959), 2 Leg. Hist. 1097. But the remedy which he proposed and which was adopted was to end "autocratic rule by placing the ultimate power in the hands of the members," 105 Cong. Rec. 6472 (1959), 2 Leg. Hist. 1099, and by giving them sufficient statutory protection to participate in a fair election to unseat an entrenched leadership.

Yet the majority somehow finds the absolute, unbending, no-contribution rule to be a reasonable regulation of a member's right to seek office and of the free and open elections that Congress anticipated. This, in spite of the availability of other means to satisfy the union's legitimate concerns about outsiders controlling their affairs through those whose campaigns they have financed. A requirement of disclosure of all contributions, together with a ceiling on contributions,

---

funds through testimonial dinners given in their honor. Opposition candidates cannot successfully match this effort.

"Union candidates' acceptance of money and other help from sources outside the union is a common and accepted practice. . . . Up until the last two years, no one, and I would emphasize no one, seriously suggested that there was anything inappropriate about union candidates soliciting financial support from non-members. . . . Union constitutions placed no such restrictions on such contributions. . . . Only within the last two years has the Steelworkers placed such a restriction in its constitution and this seems to be part of an effort of the administration to void any effective challenge by an opposition candidate in the future."

would avoid outside corruption without trampling on the rights of members to raise reasonable sums for election campaigns. Such rules would honor both purposes of the legislation: protecting against outside influence and empowering members to express their views and to challenge established leadership. As I see it, the rule at issue contradicts the values the statute was designed to protect and thwarts its purpose.

I respectfully dissent.