**KNOX COUNTY LOCAL, NATIONAL RURAL LETTER CARRIERS' ASSOC., et al., Plaintiffs-Appellants,**

v.

**NATIONAL RURAL LETTER CARRIERS' ASSOCIATION, et al., Defendants-Appellees.**

**No. 82–5357.**

United States Court of Appeals, Sixth Circuit.

Argued June 13, 1983.

Decided Feb. 17, 1984.

Daniel J. Goodman, Knoxville, Tenn., Arthur L. Fox, II (Lead Counsel), Washington, D.C., for plaintiffs-appellants.

Allen Blair (Lead Counsel), argued, Memphis, Tenn., William Peer, Washington, D.C., for defendants-appellees.

Before JONES and WELLFORD, Circuit Judges, and ALLEN, Chief District Judge.*

NATHANIEL R. JONES, Circuit Judge.

This action is presently before the Court upon the appeal of Knox County Local, National Rural Letter Carriers (Knox County Local) from an order of the district court granting summary judgment in favor of the National Rural Letter Carriers' Association, et al. (NRLCA) and denying a mandatory injunction requiring the NRLCA to publish

---

* Honorable Charles M. Allen, Chief District Judge, for the Western District of Kentucky, sitting by designation.

Knox County Local's paid advertisement in a national union magazine. Upon consideration of the issues presented by this appeal, we reverse the district court and remand this cause for a hearing under Title I of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. §§ 401 *et seq.* (LMRDA).

The facts in this case are largely uncontroverted. The NRLCA's union officers negotiated a collective bargaining agreement with the United States Postal Service in 1981. That agreement provided for the implementation of an "L-Route." The national officials admit that this provision represented a "major change" which would require "many individual carriers to suffer reduction in their route evaluations and in some instances, considerable reductions in salary." The national officials supported the ratification of the contract. The Knox County Local in Tennessee, however, vehemently opposed any contract containing an L-Route provision. A local ratification referendum among the members' elected representatives in the local union state associations was scheduled. A national convention and a ratification initiative on the agreement among those union officials entitled to vote were also scheduled.

In an effort to discourage ratification of the contract, Knox County Local attempted to publicize the contract's substantive deficiencies, to build associations among other union members opposed to those deficiencies and to inspire members to lobby their state representatives to oppose contract ratification. In order to achieve these ends, the Knox County Local delegates tried to place an advertisement in the national union magazine, *The National Rural Letter Carrier.* Knox County Local members hoped, by virtue of the publication, both to voice their opposition to the L-Route provision and to locate possible opposition to that provision in other state affiliated unions.

The *National Rural Letter Carrier* is the union's official weekly magazine and is circulated nationwide among the union's 64,-000 dues-paying members. All of the recipients of the magazine would be covered by the new collective bargaining agreement. Dues from each of those recipients help finance the publication. Commercial advertisements which are accepted for publication from members and other outside merchants also help support the magazine. No guidelines have been established to determine the quantity or content of accepted advertisements.

Knox County Local submitted to the magazine a camera-ready copy of their commercial ad together with $460.00, the standard rate for a full-page commercial ad. In an alleged effort to avoid possible union dissent created by the ad's content, the NRLCA refused to publish the advertisement. Olin Armentrout, the NRLCA secretary-treasurer and magazine editor, advised Knox County Local that "we will not accept an advertisement soliciting opposition to this contract" because it would create "internal union strife." The national union officials published the proposed contract in the magazine, however, and used that forum to urge its ratification.

In its memorandum opinion, the district court held that summary judgment was an appropriate disposition of Knox County Local's attempt to require the NRLCA to publish its views because "[n]either § 411 [of the Labor Management Reporting and Disclosure Act] nor the First Amendment guarantees advertising space in the defendants' publication ... without [their] consent." The substantive legal question which we must resolve, therefore, is whether Title I of the Labor-Management Reporting and Disclosure Act and the First Amendment prevent the NRLCA from refusing to accept a member's paid advertisement based on its content.

Title I of the Labor-Management Reporting and Disclosure Act, commonly known as the Landrum-Griffin Act, provides in pertinent part:

Section 411. Bill of Rights: Constitution and Bylaws of Labor Organizations.

(a)(1) *Equal Rights.* Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections

or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

(2) *Freedom of Speech and Assembly.* Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: provided, that nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

§ 101(a)(1) and (2); 29 U.S.C. § 411(a)(1) and (2).

This "bill of rights of members of labor organizations" is modeled after the First Amendment and guarantees to members the rights of free speech and assembly, and the right to participate in union deliberations. The legislative history of § 411 clearly demonstrates that the bill's sponsors sought to protect the rights of union members to assemble and to voice their views on union affairs without fear of union reprisal. The bill was designed to allow members to participate actively in a "democratic" union. *See* 105 Cong.Rec. 6478 (1959). § 411 originated as a Senate floor amendment, calculated to extend to union members the broad rights necessary to permit them to enjoy as union members the same rights they possess as citizens. A consultant to the sponsors of the amendment, Archibald Cox cautioned:

Because most of the bill was written on the floor of the Senate or House of Representatives and because many sections contain calculated ambiguities or political compromises ... the courts would be well advised to seek out the underlying rationale without placing great emphasis upon close construction of the words.

*See Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959,* 58 Mich.L.Rev. 819, 852 (1960). Moreover, the framers of Title I purposely drafted its provisions more loosely than other titles because they recognized the difficulty of applying a narrow remedial statute to every conceivable controversy.

Consistent with this legislative history, the Supreme Court in *Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973) rejected the argument that the absence of any specific language in Title I providing for attorney's fees indicated the congressional intent to preclude such awards. The Court emphasized the flexible nature of the LMRDA's "bill of rights":

Title I litigation necessarily demands that remedies "be tailored to fit facts and circumstances admitting of almost infinite variety," and § 102 was therefore cast as a broad mandate to the courts to fashion "appropriate relief." Indeed, any attempt on the part of Congress to spell out all the remedies available under § 102 would create the "danger that these [remedies] not listed might be prescribed with the result that the courts would be fettered in their efforts to grant relief according to the necessities of the case."

412 U.S. at 10–11, 93 S.Ct. at 1949. The Second Circuit as well, in *Navarro v. Gannon,* 385 F.2d 512 (2nd Cir.1967), stressed that the rights conferred by § 101(a)(2) could not be limited to the literal language of the Act. The Court concluded:

We must determine whether § 101(a)(2) guarantees a right to meet without interference from the international union *by considering the broad purposes of the bill of rights.*

385 F.2d at 518 (emphasis added).

The legislative history of Title I and the interpretations of that history in *Hall* and *Navarro,* therefore, compel a broad reading

of the rights conferred by §§ 101(a)(1) and (2). Furthermore, § 102 grants to the courts latitude in fashioning appropriate relief to open channels of communication among members, to facilitate the kind of informed debate which leads to enlightened self-government, and to promote the development of democracy within the union. The latitude granted to us by Title I clearly does not permit unjustifiable judicial interference with internal union affairs. That latitude, however, no less clearly does permit judicial intervention to protect the rights of union members to free speech and to receive information, without which they would be unable to exercise fully their right to participate in deliberations on union affairs.

This Court in *Blanchard v. Johnson,* 532 F.2d 1074 (6th Cir.), *cert. denied,* 429 U.S. 869, 97 S.Ct. 180, 50 L.Ed.2d 149 (1976), affirmed the district court's conclusion that the Landrum-Griffin Act's broad remedial objective of internal union democracy compels judicial intervention where a union, after granting to its members the right to vote, acts in such a manner as to make that right meaningless. Indeed judicial interference with internal union affairs is not so rare or offensive as the NRLCA would have this Court believe. Federal courts have forbidden unions from interfering with members' access to union bulletin boards at job sites, *Helton v. NLRB,* 656 F.2d 883 (D.C. Cir.1981), from preventing the distribution of literature, and from speaking in opposition to contracts at union meetings. *International Boilermakers v. Rafferty,* 348 F.2d 307 (9th Cir.1965). In addition, the courts have required unions to provide membership lists to enable members to reach a broader audience of dissent. *See e.g.,*

*Lodge 1380, BRAC v. Dennis,* 625 F.2d 819 (9th Cir.1980). Before us then is not the issue of whether the courts should ever interfere with internal union activity, but whether the principles underlying Title I justify our interference to the extent of requiring equal access to the union's national magazine in this case.[1]

The rights guaranteed to all citizens by the First Amendment are central to the democratic principles underlying Title I. In *United Steelworkers v. Sadlowski,* 457 U.S. 102, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982), First Amendment values were held to be an appropriate guide to be taken into account in the context of §§ 101(a)(1) and (2) of the LMRDA, even though the Court stated that these Title I provisions did not incorporate the "entire body of First Amendment law." 457 U.S. at 109, 111. Union prohibition of free speech must not be unreasonable. While we recognize that the First Amendment in and of itself does not require a private publication to publish any information submitted by an outsider, *see, e.g., Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), we are guided by First Amendment principles in determining whether Title I requires the national union to allow Knox County Local members access to its publication.

So guided, we conclude that, in this case, Title I requires the NRLCA to publish the paid advertisement submitted by Knox County Local. Not only is the "speech" in this case of the kind that is "protected" by the First Amendment, such "speech" goes to the core of First Amendment values. The paid advertisement is an intellectual response to a viewpoint expressed in writing by the NRLCA. The ad represents a position

---

1. The National union points out that in the *Yablonski* series of cases, the D.C. district courts reflected an animosity toward a court telling a union publication what it may or may not print. In *Yablonski v. UMW,* 307 F.Supp. 1226, 1227 (D.D.C.1969), the court ruled that courts should refrain from taking control of a union publication by ruling on what may and what may not be printed in each given case. The court found that Joseph Yablonski had failed to prove that the UMWA coverage of Tony Boyle in its publication amounted to electioneering and therefore refused to issue an injunction against further discussion of Tony Boyle

or to require the publication to print materials regarding Joseph Yablonski's exploits. However, the NRLCA failed to mention that that same district court after further union activity ordered the UMW to give the dissident candidates access to the union journal and found that the union's activity in using the union journal exclusively for the benefit of Tony Boyle amounted to a violation of the Labor-Management Reporting and Disclosure Act. *See Hodgson v. United Mine Workers,* 344 F.Supp. 17 (D.D.C.1972) (reconsideration subsequent to remand from Supreme Court).

on one side of a debate, the outcome of which affects greatly the work routine of many employees. Such a rational interchange of ideas on issues of great moment is the very goal envisioned by the framers of the First Amendment and by all proponents of a free and enlightened self-government.

Knox County Local's protected form of "speech" should not be quieted unreasonably. The NRLCA advances the prevention of "internal strife" as the interest which "compels" their refusal to publish the ad. This alleged interest, however, is based upon the NRLCA's fear that "opposition" to the contract will create dissent in the union. The national union does not suggest, nor could we accept, the notion that the dissent created by the publication of an ad would rise to the level of imminent lawless action, nor do we find that such dissent would be unreasonably disruptive.

The NRLCA desires to prevent the publication of the local's ad because of its message. In *Police Department v. Mosley,* 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972), the Supreme Court resoundingly prohibited any content-based restrictions upon expression:

> Above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.

By analogy, the LMRDA's "bill of rights" prevents the national union from unreasonably restricting the local's expression based solely on its content. *See Helton,* 656 F.2d at 883.

That the NRLCA's refusal to publish the ad is purely content-based is further evidenced by the fact that it has "opened the forum" of its publication to the commercial speech of its members and of merchants. We are guided by the Supreme Court's stern denunciation of this practice in *Mosley:*

> Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they

intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone.

408 U.S. at 96, 92 S.Ct. at 2290. When the NRLCA opened its magazine to its members and to "outside" merchants, it effectively opened the forum to the public. Having done so, the national union cannot unreasonably preclude ads submitted by its members based on their content. *See also, Helton,* 656 F.2d at 883.

This principle of equal access to an open forum is particularly acute where, as here, the union officials had themselves expended funds and promoted acceptance of the collective bargaining agreement in the publication. Furthermore, although the union leaders may control their union's publications, those publications are "owned" in equal shares by the members whose union dues finance them. The Knox County Local members thereby are precluded from using a forum which they helped to open and which they continue to support. Guided by First Amendment principles, we find therefore that the NRLCA's content-based refusal to permit access to its open forum is an impermissible and unreasonable restriction upon the rights embodied in Title I of the Landrum-Griffin Act.

Further, we cannot agree with the NRLCA's contention that because Knox County Local members had other effective avenues for expressing their views, they were properly denied access to the publication. *In Sheldon v. O'Callaghan,* 497 F.2d 1276 (2d Cir.1974), the Second Circuit addressed the question of an individual's right of access to a union journal. The individuals in that case requested access to a union journal, or, in the alternative, access to membership lists for mailing purposes. The Second Circuit granted only the request for membership lists, suggesting that access to those lists provided a viable medium through which the plaintiffs could express their views to the entire union community.

In the present case, by contrast, the NRLCA's magazine is the only economically

feasible channel of communication capable of reaching the 64,000 members of the union community. As the Knox County Local members are relatively small in number, the cost of a bulk mailing would have been impracticable. By refusing to allow those members access to its union-wide publication, the NRLCA foreclosed the only reasonable avenue for the effective communication of opposition to the new agreement.

Prevailing First Amendment principles therefore prevent those in "control" of a *protected, open* and *exclusive* forum of communication from unreasonably refusing to allow co-owners access to that forum based solely upon the *content* of their expression. Interpreted in light of these principles, we hold that the provisions of Title I of the Landrum-Griffin Act preclude the NRLCA from unreasonably denying Knox County Local members access to its protected open and exclusive forum of communication merely because of the content of the expression.

Accordingly, we reverse the district court's summary disposition of the case and remand for a hearing consistent with the views expressed herein.