William E. BROCK, III,* Secretary of Labor, United States Department of Labor, Plaintiff-Appellant,

v.

WRITERS GUILD OF AMERICA, WEST, INC., Defendant-Appellee.

No. 84–6013.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 7, 1985.

Decided June 11, 1985.

van. *See* Fed.R.App.P. 43(c)(1).

Bette J. Briggs, U.S. Dept. of Labor, Washington, D.C., for plaintiff-appellant.

Julius Reich, Reich, Adell, & Crost, Los Angeles, Cal., for defendant-appellee.

Before WRIGHT, ALARCON, and NORRIS, Circuit Judges.

ALARCON, Circuit Judge:

Appellant William E. Brock, III, Secretary of Labor for the United States Depart-

ment of Labor (hereinafter the Secretary) appeals from the district court's judgment dismissing his complaint challenging a union election conducted by appellee Writers Guild of America, West, Inc. (hereinafter the Guild), and from the district court's *sua sponte* award of attorneys' fees to the Guild. This appeal requires us to resolve a novel question of statutory construction: whether section 401(c)[1] of the Labor-Management Reporting and Disclosure Act of 1959 (hereinafter LMRDA), 29 U.S.C. § 481(c), which requires that unions provide adequate safeguards to insure fair union elections, affords the Secretary the power to challenge a union's decision to permit supervisors to participate as candidates in a union election.

I

FACTUAL BACKGROUND

On September 15 and 16, 1983, the Guild (a labor organization subject to the provisions of Title IV of the LMRDA regarding the conduct of union elections) conducted an election of officers. The Guild permitted two individuals who held supervisory or management positions in the entertainment industry to participate as candidates.[2] One was employed as a director/producer/writer for a television series; the other was a director for an episodic television program.

Having exhausted his internal union remedies, Guild member Edmund Morris filed a complaint with the Secretary pursuant to LMRDA § 402(a). The Secretary investigated the complaint and found probable cause to believe that a violation of Title IV of the LMRDA had occurred. Specifically, the Secretary determined that, by allowing supervisors to participate as candidates in the election, the Guild failed to provide the adequate safeguards to insure a fair election required by LMRDA § 401(c).

The Secretary brought an action in district court pursuant to LMRDA

1. Section references are to the LMRDA as enacted rather than to the United States Code, unless otherwise specified.

2. The Guild's constitution and bylaws do not impose any restriction on supervisorial candidacy for union office.

§§ 401(c) and 402(b), challenging the election and seeking an order setting it aside and directing a new election under the Secretary's supervision. The district court granted the Guild's summary judgment motion and dismissed the Secretary's complaint on the following grounds: (1) the complaint fails to state a claim upon which relief can be granted because LMRDA § 402(b) does not confer jurisdiction on the court to hear actions to set aside union elections based upon the alleged participation of supervisors as candidates for union office;[3] (2) the court's jurisdiction was "preempted" because the alleged participation of supervisors as candidates in a union election is a matter within the exclusive jurisdiction of the National Labor Relations Board (hereinafter NLRB);[4] and (3) exclusive jurisdiction to determine supervisory status lies with the NLRB. The court also awarded the Guild its costs of suit and reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

Because we conclude that the LMRDA does not authorize the Secretary to set aside a union election based upon the participation of supervisors as candidates for union office, we affirm the district court's judgment solely on the ground that the complaint fails to state a claim upon which relief can be granted.[5] We confine our analysis of this case to the narrow issue whether the Secretary's complaint states a claim under LMRDA §§ 401(c) and 402(b).

---

3. To the extent that the district court's conclusion can be read as a finding that the court lacked subject matter jurisdiction to hear the Secretary's complaint, the court's conclusion is erroneous. The Secretary's complaint alleges a violation of a federal statute, LMRDA § 401(c), over which the district court has jurisdiction pursuant to LMRDA § 402(b). For purposes of determining whether federal question jurisdiction exists, a district court need only ascertain whether the cause of action alleged is patently without merit (*see Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 70–71, 98 S.Ct. 2620, 2628–2629, 57 L.Ed.2d 595 (1978)), or clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction (*see Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 279, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977)). The court necessarily assumes jurisdiction to decide whether a complaint states a cause of action upon which relief can be granted. *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). Because jurisdiction is not defeated by the *possibility* that the complaint might fail to state a claim upon which recovery can be had, the failure to state a valid claim is not the equivalent of a lack of subject matter jurisdiction, and calls for a judgment on the merits rather than for a dismissal for lack of jurisdiction. *Rodriguez v. Flota Mercante Grancolombiana, S.A.*, 703 F.2d 1069, 1072 (9th Cir.), *cert. denied*, — U.S. ——, 104 S.Ct. 84, 78 L.Ed.2d 94 (1983).

4. We reject the district court's characterization of this issue in terms of "preemption" of the Secretary's authority. The use of the term "preemption" and the court's citation to *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) are inapposite. Issues of preemption are implicated where a state has acted in an area which is reserved to the federal government, in violation of the Supremacy Clause. *Garmon* involved a state court's attempt to regulate activity which was arguably subject to the NLRA and within the primary jurisdiction of the NLRB. In contrast, the present action raises questions concerning the overlap of two federal statutes.

5. Those courts which have addressed the NLRB's primary jurisdiction over management-labor relations as an independent ground barring a claim initially brought in federal court have successfully negotiated the threshold issue whether the agency or individual seeking to enforce the claim has the statutory authority to do so. *See, e.g., International Brotherhood of Boilermakers v. Hardeman*, 401 U.S. 233, 245, 91 S.Ct. 609, 616, 28 L.Ed.2d 609 (1971) (action by union member alleging that union denied him full and fair hearing during union disciplinary proceedings was expressly authorized by 29 U.S.C. §§ 411(a)(5) and 412; courts have power to examine statutory provisions and to determine whether union member was misled or otherwise prejudiced in presentation of his defense); *Cooke v. Orange Belt District Council of Painters No. 48*, 529 F.2d 815, 819–20 (9th Cir. 1976) (complaint by union official challenging a retaliatory job assignment as discipline for intraunion political activity states a violation of LMRDA § 609); *Grand Lodge of International Association of Machinists v. King*, 335 F.2d 340, 343 (9th Cir.) (discharged union officers alleging wrongful discharge because they state a claim under LMRDA §§ 101(a)(1), 101(a)(2), and 609), *cert. denied*, 349 U.S. 920, 85 S.Ct. 274, 13 L.Ed.2d 334 (1964), *disapproved on other grounds, Finnegan v. Leu, supra*, 456 U.S. at 438–39, 102 S.Ct. at 1871–72 n. 9.

## II

### ORDER GRANTING SUMMARY JUDGMENT

■ The question on this appeal arises out of the tension between two conflicting policies embodied in Title IV of the LMRDA: the need to afford the Secretary sufficient authority to ensure free and democractic union elections so that union corruption may be avoided, and the policy against unnecessary governmental intrusion into union affairs. The Secretary contends that the portion of LMRDA § 401(c) which requires unions to provide "[a]dequate safeguards to insure a fair election" was intended to authorize him to intervene and set aside a union election based upon the participation of supervisors as candidates. We disagree with the Secretary's reading of section 401(c) because such a construction would establish a *per se* rule of non-eligibility for supervisory candidates. Because "[t]here is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted" (*Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625, 98 S.Ct. 2010, 2015, 56 L.Ed.2d 581 (1978)), we refuse to extend the statute "beyond the point where Congress ... would stop." *62 Cases of Jam v. United States*, 340 U.S. 593, 600, 71 S.Ct. 515, 520, 95 L.Ed. 566 (1951).

In construing a statute in a case of first impression, we look to the traditional signposts of statutory construction: first, the language of the statute itself (*see North Dakota v. United States*, 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983); *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982)); second, its legislative history (*see Heckler v. Turner*, — U.S. —, 105 S.Ct. 1138, 1144–45, 84 L.Ed.2d 138 (1985)), and as an aid in interpreting Congress' intent, the interpretation given to it by its administering agency (*see Heckler v. Turner, supra* 105 S.Ct. at 4214; *Winterrowd v. David Freedman & Co., Inc.*, 724 F.2d 823, 825 (9th Cir.1984)).

### A. *Language of LMRDA § 401(c)*

■ Title IV of the LMRDA (§§ 401–03) deals generally with the conduct of union elections. *See* 29 U.S.C. §§ 481–83. Section 401, entitled "Terms of office and election procedures," establishes minimum *procedural* standards for the conduct of elections. 29 U.S.C. § 481. Subsection (c) contains a set of rights designed to insure that every candidate for union office is afforded equal access to the voting members. The last sentence of section 401(c) provides:

> Adequate safeguards to insure a fair election shall be provided, including the right of any candidate to have an observer at the polls and at the counting of the ballots.

29 U.S.C. § 481(c). LMRDA § 402(b) confers jurisdiction on the federal district courts to hear complaints brought by the Secretary which allege violations of LMRDA § 401. It provides, in relevant part, as follows:

> The Secretary shall investigate such complaint [of an individual member of a labor organization alleging the violation of a provision of LMRDA § 401] and, if he finds probable cause to believe that a violation of this subchapter has occurred and has not been remedied, he shall, within sixty days after the filing of such complaint, bring a civil action against the labor organization as an entity in the district court of the United States in which such labor organization maintains its principal office to set aside the invalid election, if any, and to direct the conduct of an election ... under the supervision of the Secretary and in accordance with the provisions of this subchapter and such rules and regulations as the Secretary may prescribe.

29 U.S.C. § 482(b).

Neither the language nor the context of the "adequate safeguards" provision supports the broad construction of the statute which the Secretary urges. Section 401(c) makes no reference to candidate eligibility, nor does it draw any distinction between union members based upon their supervi-

sorial status. Moreover, the adequate safeguards provision is immediately followed by two examples typifying the procedural safeguards which are required: (1) every candidate has the right to have an observer at the polls, and (2) every candidate has the right to have an observer at the counting of the ballots. LMRDA § 401(c), 29 U.S.C. § 481(c). Had Congress intended the adequate safeguards provision to encompass such substantive protections as restrictions on candidate eligibility, it seems unlikely that it would have included as examples two such purely procedural rights.

Moreover, section *401(e)*—which *does* address candidate eligibility—is similarly devoid of any prohibition against *supervisorial* candidacy. To the contrary, it confers a blanket grant of eligibility on all union members in good standing:

> [E]very member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 of this title and to reasonable qualifications uniformly imposed)
>
> . . . .

Section 504 of the LMRDA restricts the eligibility of felons and members of the

Communist Party. *See* 29 U.S.C. § 504(a). It contains no reference to supervisors.[6]

The fact that Congress itself expressly established certain minimal qualifications for candidates for union office in section 504, taken in combination with its broad statement of member eligibility in section 401(e), suggests that Congress intended that unions retain the freedom *not* to impose additional candidacy qualifications. *But cf. Brown v. Hotel & Restaurant Employees Local No. 54,* —— U.S. ——, 104 S.Ct. 3179, 3187-90, 82 L.Ed.2d 373 (1984) (NLRA § 7, guaranteeing to employees the right to bargain collectively through representatives "of their own choosing," does not necessarily preempt all state regulations imposing candidacy qualifications which ultimately restrict the rights of employees to select certain individuals as union officers).[7] The conspicuous absence in the LMRDA of any candidacy qualifications based upon supervisorial status persuades us that Congress did not intend to impose any qualifications other than those expressly set forth in section 504(a).

### B. Congressional Intent

■ The LMRDA was "the product of Congressional concern with widespread

---

6. Indeed, the LMRDA as a whole draws no distinction between supervisory and non-supervisory union members. The concept is apparently imported from the National Labor Relations Act (NLRA), as amended, 29 U.S.C. § 151 *et seq.* (1976), which deals with the relationship between management and labor.

7. In *Brown,* the Supreme Court rejected the argument that Congress intended LMRDA section 504(a) to be the outside limit on the right of employees to select the officers of their bargaining representatives pursuant to NLRA § 7. *Brown, supra,* 104 S.Ct. at 3188. The Court's rejection of the argument in the context of preserving the validity of state laws imposing minimum qualifications on candidates is not transferrable to the present action.

In *Brown,* the Court relied heavily upon LMRDA § 603(a), an anti-preemption provision affirmatively preserving the operation of *state* laws. *See id.* The Court observed that section 603(a) indicates that Congress "necessarily intended to preserve *some* room for state action concerning the responsibilities and qualifications of union officials." *Id.* The Court also noted that the disqualification criteria embodied

in LMRDA § 504 (i.e., the restrictions on the candidacy of persons convicted of certain state law crimes) are premised on the existence of state laws. *Id.* Finally, the Court found that because enactment of the LMRDA was prompted by the inadequacies of existing state governmental machinery in policing internal union corruption, more stringent state regulation of the qualifications of union officials was not incompatible with national labor policy. *Id.* 104 S.Ct. at 3189.

In the instant case, we are presented with an attempt by the Secretary of Labor, acting as an arm of the federal government, to impose upon the Guild a candidacy qualification which is not expressly authorized by the LMRDA. While in *Brown* the state officials sought to impose on a union candidacy restrictions established by an independent state statutory scheme, the Secretary relies solely upon his construction of a subsection of the same statute (LMRDA § 401(c)) which confers blanket eligibility on union members. Moreover, neither the anti-preemption provision which operates to preserve state laws nor the policy favoring more stringent state regulation at issue in *Brown* are applicable to this case.

abuses of power by union leadership." *Local No. 82, Furniture & Piano Moving v. Crowley,* — U.S. —, 104 S.Ct. 2557, 2563, 81 L.Ed.2d 457 (1984) (*quoting Finnegan v. Leu,* 456 U.S. 431, 435, 102 S.Ct. 1867, 1870, 72 L.Ed.2d 239 (1982)). The special function of Title IV in furthering the overall goals of the LMRDA is to insure "free and democratic" union elections. *Wirtz v. Local 153, Glass Bottle Blowers Association,* 389 U.S. 463, 470, 88 S.Ct. 643, 647, 19 L.Ed.2d 705 (1968). Congress meant to further this basic policy, however, with a minimum of governmental interference in the internal affairs of unions. *See Donovan v. Hotel, Motel & Restaurant Employees Local 19,* 700 F.2d 539, 547 (9th Cir.1983). Title IV was Congress' attempt to balance these competing policies.

Both the Supreme Court and this court have emphasized Congress' determination not to interfere with union affairs unless it is absolutely necessary. *See United Steelworkers of America v. Sadlowski,* 457 U.S. 102, 117, 102 S.Ct. 2339, 2348, 72 L.Ed.2d 707 (1982); *Donovan v. Local 19, supra,* at 547. The reason for this concern was clear: Congress did not want the federal government (acting through the Secretary) to become excessively involved in union politics. *See Donovan v. Local 19, supra,* at 547. The Supreme Court summarized Congress' intent as follows:

> In drafting Titles II through VI, Congress was guided by the general principle that unions should be left free to 'operate their own affairs, as far as possible.' S.Rep. No. 1684, 85th Cong., 2d Sess., 4–5 (1958). It believed that only essential standards should be imposed by legislation, and that in establishing those .standards, great care should be taken not to undermine union selfgovernment. Given certain minimum standards, 'individual members are fully competent to regulate union affairs.' *Ibid.* Thus, for example, in Title IV, which regulates the conduct of union elections, Congress simply set forth certain minimum standards. So long as unions conform with these standards, they are free 'to run their own elections.'

*United Steelworkers of America v. Sadlowski, supra,* at 117, 102 S.Ct. at 2348. As this court has noted, Congress believed that "[g]iven the maintenance of minimum democratic safeguards and detailed essential information about the union, the individual members are fully competent to regulate union affairs." *Donovan v. Local 19, supra,* at 547 n. 12 (*quoting* S.Rep. No. 187, 86th Cong., 1st Sess. 7, *reprinted in* 1959 U.S.Code Cong. & Ad.News 2318, 2323, *and in* 1 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, 403 (1959) (hereinafter Leg.Hist.)).

The pivotal question on this appeal is what Congress meant by "minimum democratic safeguards" and "adequate safeguards to insure a fair election." The Secretary argues that the potential for retaliation against the rank-and-file union members must render supervisors ineligible to participate in union elections as candidates for union office. He reasons that such potential for abuse is likely to chill the free exercise of voting rights and thus to render the election inherently unfair. The Secretary concludes that these dangers were precisely those which Title IV was designed to prevent.

We disagree. The legislative history and the Secretary's own administrative regulations interpreting Title IV combine to persuade us that Congress did not intend to afford the Secretary the unilateral authority to determine candidate eligibility for union office.

### 1. *Legislative History*

The Secretary argues that the changes made to the LMRDA during its progress through both houses of Congress reflect a Congressional intent to afford him broad authority to intervene in union elections to insure that they are conducted fairly. The Senate passed the predecessor to the LMRDA, the Kennedy-Ervin bill (S. 1555), on April 25, 1959. 105 Cong.Rec. 6048 (1959); 2 Leg.Hist. at 1257. The Senate bill provided:

Adequate union safeguards *to insure a fair count of the ballots* shall be provided....

S. 1555, 86th Cong., 1st Sess. (1959); 105 Cong.Rec. 40 (1959); 1 Leg.Hist. at 555 (emphasis added). On August 14, 1959, the House, working on another track, passed the Landrum-Griffin bill (H.R. 8342). 105 Cong.Rec. 14541 (1959); 2 Leg.Hist. at 1702. The House bill broadened the safeguards requirement to the form in which it was ultimately enacted ("Adequate safeguards to insure a fair election shall be provided...."), eliminating the qualifying phrase "to insure a fair count of the ballots." H.R. 8342, § 401(b), 86th Cong., 1st Sess. (1959); 105 Cong.Rec. 14536 (1959); 2 Leg.Hist. at 1697.

The Senate Conference Committee was formed on August 17, 1959. 105 Cong.Rec. 14608 (1959); 2 Leg.Hist. at 1351. During August, the Conference Committee considered the differences between the two bills and accepted the House version of the adequate safeguards provision. On September 2, 1959, the Committee submitted a report to the Senate embodying its recommendations. 105 Cong.Rec. 16333 (1959); 2 Leg.Hist. at 1400. On September 3, 1959, the Senate approved the Conference Committee Report. 105 Cong.Rec. 16435 (1959); 2 Leg.Hist at 1453. On September 14, 1959, Senator Goldwater placed into the record a study prepared by a staff member summarizing the actions taken by the Conference Committee on the respective labor bills of the House and Senate. 105 Cong. Rec. 19764 (1959). The study concluded:

> The Senate bill requires the union to establish safeguards for a fair count of the ballots. The Landrum-Griffin bill contained a much broader protection—it required adequate safeguards for a fair election which goes beyond a mere count of the ballots. The conferees accepted the language of the Landrum-Griffin bill.

*Id.*

The Secretary asserts that the Committee's rejection of the narrower Senate bill language indicates that Congress intended to expand the mechanical protections afforded by section 401(c) to include substantive protections such as restrictions on candidate eligibility. While we agree that the Committee's action reflects an intent to expand the reach of the adequate safeguards provision, we are persuaded that Congress meant only to broaden the types of *procedural* protections available. Congress did not intend to confer upon the Secretary the power to promulgate substantive restrictions on candidate eligibility. *See* 105 Cong.Rec. 16387 (1959); 2 Leg. Hist. at 1416 (statement of Senator Morse) ("The important [purpose of section 401(c) ] is to get the democratic *procedure*, and then to let the union run its own internal affairs in keeping with that democratic *procedure*....") (emphasis added).

■ Moreover, like the panel in *Donovan v. Local 19, supra,* we decline to attribute much weight to Senator Goldwater's staff reports. *See id.* at 545. Senator Goldwater was opposed to the enactment of S. 1555 because he believed that it inadequately regulated union behavior. *Id.* at 545–46 n. 10. The remarks of legislators opposed to legislation are entitled to little weight in the construction of statutes. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 203 n. 24, 96 S.Ct. 1375, 1386 n. 24, 47 L.Ed.2d 668 (1976); *Donovan v. Local 19, supra,* at 544 n. 7. Furthermore, because the study was inserted into the record *after* the Committee's Report had been approved by the Senate the conclusions expressed therein are post-enactment statements which constitute poor evidence of Congressional intent. *See Donovan v. Local 19, supra,* at 545 n. 9.

In short, nothing in the legislative history of LMRDA § 401(c) suggests that Congress intended that the adequate safeguards provision operate to prohibit supervisorial candidacy. As the Supreme Court has observed:

> When even after [going behind the plain language of a statute in search of a possibly contrary congressional intent] nothing in the legislative history remotely suggests a congressional intent contrary to Congress' chosen words ... any

further steps take the courts out of the realm of interpretation and place them in the domain of legislation.

*United States v. Locke,* —— U.S. ——, 105 S.Ct. 1785, 1793, 85 L.Ed.2d 64 (1985). We decline the Secretary's implied invitation that we assume the role of legislators.

### 2. *The Secretary's Administrative Regulations*

▪▪▪▪ The Secretary urges us to look to his administrative regulations promulgated under Title IV for guidance in interpreting section 401(c). We consider the Secretary's regulations as an aid in interpreting Congress' intent, but they are not binding on us. *Donovan v. Sailors' Union of the Pacific,* 739 F.2d 1426, 1429 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1866, 85 L.Ed.2d 160 (1985). The Secretary's administrative regulations will not remedy a lack of statutory authority for his claim. As the Supreme Court has observed:

> The rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law. Rather, it is the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.

*Ernst & Ernst v. Hochfelder, supra,* 425 U.S. at 213–14, 96 S.Ct. at 1391 (citations omitted).

The Secretary relies upon 29 C.F.R. § 452.47, the only regulation pertaining to candidate eligibility. It provides, in relevant part:

> Inasmuch as it is an unfair labor practice under the [NLRA] for an employer (including persons acting in that capacity) to dominate or interfere with the administration of any labor organization, it follows that employers, while they may be members, may not be candidates for office or serve as officers.

The Secretary's reliance upon section 452.47 is misplaced. Section 452.47 was promulgated under LMRDA section *401(e),* and does not purport to interpret the adequate safeguards provision of section 401(c). Rather, it establishes guidelines for a union which wishes to impose candidate eligibility requirements under the "reasonable qualifications" provision of section 401(e). It does not follow that simply because a qualification prohibiting the eligibility of supervisor candidates would be reasonable if imposed by a union, the Secretary has authority to impose such an eligibility requirement on the union through section 401(c).

Moreover, the Secretary's Title IV regulations contain a provision entitled "Adequate Safeguards" (*see* 29 C.F.R. § 452.-110) which specifically interprets section 401(c). That regulation contains no reference to candidate eligibility or to supervisors. Instead, it gives two examples of required adequate safeguards: (1) if one candidate is permitted to have his nickname on the ballot, the other should enjoy the same privilege, and (2) voting instructions must be intelligible. 29 C.F.R. § 452.110. The inclusion of these mechanical procedural safeguards as examples of the required safeguards suggests that the Secretary, like Congress, construed the adequate safeguards provision narrowly.

The Secretary also contends that Regulation 452.47 affords the Guild fair notice that supervisorial candidacy is prohibited by section 401(c). Because the Regulation was promulgated pursuant to section *401(e),* however, the Guild received no notice of the requirements of section 401(c). Section 401(e) and Regulation 452.47 pertain only to the candidacy qualifications which a *union* may require through its constitution and bylaws. Because the Guild's constitution and bylaws do not impose any such restrictions on candidates, it had no reason to assume that Regulation 452.47 was applicable to the eligibility of union members in good standing.

The administrative rulings and court cases to which the Secretary points as evidence of fair notice to the union only serve to underscore the crucial difference between section 401(c) and 401(e). All but one of the decisions cited interpret the reasonable qualifications provision of section

*401(e)* and the regulations (C.F.R. §§ 440.-1910–2000) promulgated thereunder. *See, e.g., Electrical Workers (IBEW), Local 164*, No. 32–5180 (May 4, 1978) (union violated section 401(e) when it allowed constitutionally ineligible supervisor to run for and hold office); *accord, Marshall v. Longshoremen, Local 1593*, No. 42–3835 (M.D. Fla. filed Sept. 1, 1977). On the only previous occasion when the Secretary sought to invoke section *401(c)* to set aside a union election on the ground that a union allowed two supervisors to run for office, the court dismissed the action for failure to exhaust internal union remedies, never reaching the merits. *See Donovan v. Electrical Workers (IBEW), Local 126*, 113 L.R.R.M. 3725, 3726–27 (E.D.Pa.1982), *vacated* 728 F.2d 610 (3d Cir.), and *remanded without op.* 732 F.2d 145 (3d Cir.1984).

Finally, by requiring that the Guild make a determination as to the supervisory status of every candidate for union office, the Secretary's construction of section 401(c) would shift to the Guild the burden of preventing employer interference in union affairs. Such a construction would expose the Guild to legal attack by disqualified candidates and unsuccessful candidates, and would force the Guild to assume a role for which it lacks any expertise. The fact that unions may and routinely do make determinations of supervisory status pursuant to section *401(e) (see, e.g., McDonald v. Oliver*, 525 F.2d 1217, 1223, 1231 (5th Cir.), *cert. denied*, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976)), does not avoid these dangers. As we have noted, there is a significant difference between a voluntarily-enacted union eligibility requirement and a governmentally-imposed eligibility requirement. While the former furthers the attainment of the underlying Congressional goal of union self-government, the latter hinders it.[8]

**8.** Because we conclude that the Secretary lacks the authority under section 401(c) to prohibit supervisors who are union members in good standing from participating as candidates in union elections, we do not reach the question whether the Secretary's authority to enforce LMRDA Title IV rights overlaps the NLRB's exclusive jurisdiction to enforce the NLRA. We construe the district court's alternate grounds for dismissal (i.e., that the NLRB has exclusive jurisdiction over both the eligibility of supervisors as candidates for union office and the determination of what constitutes supervisorial status) not as independent theories that support the judgment below, but as additional factors indicative of Congress' intent to limit the scope of section 401(c) to procedural safeguards.

The Secretary argues that Congress' intent in enacting LMRDA § 401(c) was to supplement existing employee rights created by the NLRA. The Guild contends that the two sets of rights do not overlap, and that Congress did not intend by enacting section 401(c) to thrust the Secretary into the arena of management-union relations. The NLRA governs the relationship between labor organizations and management. *See generally* NLRA § 1, 29 U.S.C. § 151. Congress gave the NLRB exclusive authority to administer the NLRA and primary jurisdiction as an administrative tribunal to enforce its provisions. *See Burke v. French Equipment Rental, Inc.*, 687 F.2d 307, 311 (9th Cir.1982). Section 8(a)(2) of the NLRA makes it unlawful for an employer to "dominate or interfere with the formation or administration of any labor organization...." 29 U.S.C. § 158(a)(2). NLRA § 2(11) defines the term "supervisor," and the definition of "employee" explicitly excludes supervisors. *See* NLRA § 2(3), 29 U.S.C. § 152(3). Therefore, under the NLRA a supervisor is an employer.

The NLRB first disapproved the participation of high ranking supervisors in a union election two years before enactment of the LMRDA, in *Nassau & Suffolk Contractors' Association, Inc.*, 118 N.L.R.B. 174 (1957), finding that such conduct constitutes an unfair labor practice by the employer under NLRA § 8(a)(2). The Board reasoned that a potential harm in allowing supervisors to participate as candidates lies in having agents of the employer sitting on both sides of a bargaining table, making arm's-length bargaining impossible. *Id.* at 187. Such a conflict between the interests of labor and management is exactly what the NLRA was designed to prevent.

In contrast, the LMRDA was Congress' first attempt to regulate *intra*-union affairs. *Trbovich v. U.M.W.*, 404 U.S. 528, 530, 92 S.Ct. 630, 632, 30 L.Ed.2d 686 (1972). Congress gave the Secretary primary responsibility for the enforcement of the LMRDA (*Local No. 82, Furniture & Piano Moving v. Crowley, supra*, 104 S.Ct. at 2565 n. 14), and conferred jurisdiction on the federal district courts to hear actions brought by the Secretary for violations of Title IV. *See* LMRDA § 402(b), 29 U.S.C. § 482(b).

Federal district courts are courts of limited jurisdiction; their power is limited to those areas specifically conferred by Congress. U.S. Const. Art. III. Congress delegated the arena of management-union relations to the NLRB. *See Burke v. French Equipment Rental, supra*, at 311. Congress was presumably aware when it

The district court did not err in its conclusion that the complaint failed to state a claim under LMRDA §§ 401(c) and 402(b) because Congress has not authorized the Secretary to impose upon unions substantive requirements concerning the eligibility of candidates for union election.

## III

### AWARD OF ATTORNEYS' FEES AND COSTS

■ The Secretary also appeals from the district court's *sua sponte* award of

reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412. Pursuant to section 2412(d),[9] a prevailing party in an action brought by the United States may, upon timely application, recover its attorneys' fees unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.[10] Because the district court's *sua sponte* award of fees in the present case contravenes the mandatory language of section 2412(d) and deprives the Secretary of an opportunity to be heard on the issue

enacted the LMRDA that the NLRB was exercising its jurisdiction to disapprove supervisor participation in union elections. *See Albernaz v. United States*, 450 U.S. 333, 341–42, 101 S.Ct. 1137, 1143–44, 67 L.Ed.2d 275 (1981) (because Congress is composed predominately of lawyers, court may assume that Congress is aware of existing law). Congress' failure to make any express provision in the LMRDA of similar authority to the Secretary suggests that Congress did not intend to authorize the Secretary unilaterally to impose candidacy qualifications imported from the NLRA, nor to seek the assistance of the district court in the enforcement of such restrictions. *See Albernaz v. United States, supra,* at 341–42, 101 S.Ct. at 1143–44 (if anything can be presumed from congressional silence, it is that Congress was aware of existing law and legislated with it in mind).

The Secretary argues that Title I of the LMRDA has been interpreted to confer cumulative rights which overlap with those created by the NLRA, and urges us to adopt a similar construction of Title IV rights. Title I of the LMRDA creates a bill of rights for union members. The Supreme Court has held that Title I rights are cumulative to and overlap with rights created by the NLRA. *See International Brotherhood of Boilermakers v. Hardeman, supra,* 401 U.S. at 238–39, 91 S.Ct. at 613–14; *accord, Cooke v. Orange Belt District Council of Painters No. 49, supra,* at 820.

The Secretary's analysis is flawed. Congress included in Title I an expression of its intent to create federal rights which would overlap and supplement existing protections. *See* LMRDA § 103, 29 U.S.C. § 413 (rights in this *subchapter* are cumulative); *Cooke v. Orange Belt District Council of Painters No. 48, supra,* at 820. Indeed, Congress' failure to include a similar statement in Title IV when it took care to do so in Title I suggests a contrary intention. Furthermore, the Supreme Court itself has emphasized the distinction between Title I, where governmental interference to enforce rights is condoned, and Titles II through VI, where the principal value at stake is the presumption of union self-government. *See United Steelworkers of*

*America v. Sadlowski, supra,* 457 U.S. at 117, 102 S.Ct. at 2348.

Finally, the Secretary posits that Congress must have intended to grant him the power to intervene in union elections to contest candidate eligibility because the LMRDA affords him a unique retrospective remedy—the power to set aside elections—while the NLRB's remedy is limited to a prospective order directing the employer to cease and desist from dealing with a union which permits supervisors to serve as officers. *See Nassau, supra,* at 188–89. This argument stands the relevant inquiry on its head. The dispositive issue is whether Congress intended to afford the Secretary the opportunity to exert such admittedly substantial governmental influence over internal union affairs. Indeed, in light of the policy against excessive governmental intrusion into internal union affairs, the fact that Congress created such a powerful remedy for the Secretary militates strongly in favor of a narrow construction of section 401(c). *See supra* section IIB.

9. Subsection (d) was repealed effective October 1, 1984, but continues to apply through the final disposition of any action commenced before that date. The present action was commenced well before October 1, 1984, and therefore subsection (d) is applicable.

10. Subsection (b) of section 2412 also provides for an award of fees to the prevailing party in a civil action brought by or against the United States, and renders the United States liable "to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." Subsection (b) does not require an application for fees or a hearing on the matter. However, this court has found no common law or statutory authority for such an award in the Title IV context. *See Donovan v. Hotel, Motel & Restaurant Employees Local 19,* 700 F.2d 539, 548 n. 15 (9th Cir.1983). Thus, the district court's fee award must stand or fall under subsection (d).

of the Guild's entitlement to the fees awarded, we reverse that portion of the order.

Section 2412(d)(1)(B) plainly states that the filing of an application for fees is a prerequisite to a fee award. The statute provides that a party seeking an award "*shall*, within thirty days of final judgment in the action" submit an application containing a request for fees, an itemization, and a statement as to why the government's position was not substantially justified. 28 U.S.C. § 2412(d)(1)(B); *see also Rawlins v. United States*, 686 F.2d 903, 914 (Ct.Cl.1982) (court could not consider plaintiff's claim for fees on appeal because plaintiff had not filed required fee application under section 2412(d)(1)(B)). The purpose and necessity for such an application is equally apparent: the court has discretion to reduce or deny such a fee award if the prevailing party engaged in conduct which unduly protracted the resolution of the controversy, the fees sought are excessive, the position of the United States was substantially justified, or special circumstances exist which would make an award unjust. *See* section 2412(d)(1) and (2). By failing to await the filing of such an application, the district court deprived the Secretary of an opportunity to be heard on the issue of the Guild's entitlement to fees. Therefore, the district court erred in making a *sua sponte* award of fees to the Guild.

Although neither party raised the point, the Guild's failure to file a fee application within thirty days from the date of entry of the district court's order granting summary judgment in its favor presents a potential barrier to our remand of the matter of fees. This court has strictly construed the requirement of section 2412(d)(1)(B) that an application be filed within thirty days from the date of final judgment. *See McQuiston v. Marsh*, 707 F.2d 1082, 1085 (9th Cir.1983) (request for fees under section 2412(d) untimely if filed more than thirty days after entry of final judgment in the district court; filing of appeal does not toll the statute). *But cf. Taylor v. United States*, 749 F.2d 171, 174 (3d Cir.1984) (thirty day period for fee application begins to run when government's right to appeal has lapsed, or after completion of appellate proceedings); *accord, McDonald v. Schweiker*, 726 F.2d 311, 315 (7th Cir.1983).

The equities of the present case, however, dictate a different result. In *McQuiston*, we were not faced with a *sua sponte* award by the district court. Where the district court misleads the prevailing party by making such an award, it would be grossly unfair to hold that the party's failure to file an application within thirty days from entry of the court's order bars recovery of fees. *See Hernandez-Rivera v. I & NS*, 630 F.2d 1352, 1354–55 (9th Cir.1980) (official misleading by the district court as to the time within which a timely notice of appeal may be filed justifies a finding of constructive filing within jurisdictional time limits).

Therefore, the Guild will have thirty days from the date of entry of this court's order to file an application for fees. Assuming that the Guild files a timely application, the matter of entitlement to fees is remanded to the district court for a determination pursuant to 29 U.S.C. § 2412(d) as to whether the Secretary's position was substantially justified so as to preclude an award of attorney's fees.

## IV

## CONCLUSION

We uphold the district court's dismissal of the Secretary's complaint for failure to state a claim because Congress has not authorized the Secretary to impose restrictions on candidate eligibility for union office. The trial court erred in granting attorneys' fees to the Guild *sua sponte*.

The judgment is AFFIRMED. The award of attorneys' fees is REVERSED and REMANDED.